YELVERTON, Judge.
Defendant, Irving Broussard, was charged with aggravated arson, in violation of La. R.S. 14:51, and attempted first-degree murder, in violation of La. R.S. 14:30 and La. R.S. 14:27. A jury found him guilty of the aggravated arson charge, and not guilty of attempted first-degree murder. Defendant appeals the conviction alleging that the evidence was insufficient to convict.
On June 14, 1986, a fire began in a storage shed located behind the residence at 136 Friendship Street in Lafayette. It spread from the utility shed to the wall of the house which was located three feet from the shed. There were two residences on this property. The primary residence and the utility shed were owned by Clifton Broussard, defendant’s father. Defendant lived there with his father and mother. The other house was owned by Alvin Broussard, defendant’s brother. It was rented to Helen Daniels. An investigation of the fire led to defendant’s arrest on charges of aggravated arson and attempted first-degree murder.
The crime of aggravated arson is defined by La. R.S. 14:51 as the intentional damaging by any explosive substance or the setting fire to any structure, watercraft, or movable whereby it is foreseeable that human life might be endangered. The testimony presented at trial clearly established that the fire in the instant case was intentionally set and it was foreseeable that the life of at least Helen Daniels might be endangered. The precise issue on appeal is whether there was sufficient evidence to support the jury’s finding that the fire was set by defendant.
The standard of review applicable to sufficiency questions is whether the evidence, viewed in a light most favorable to the prosecution, reasonably supports the verdict. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Honeycutt, 438 So.2d 1303 (La.App. 3 Cir.1983) writ denied, 443 So.2d 585 (La.1983).
A summary of the testimony reveals the following facts. Pamela Guidry, a police officer with the City of Lafayette, was called to 136 Friendship Street on June 14, 1986, in reference to a fire. Upon arriving at the scene, she observed defendant sitting on the steps on the rental residence, a portion of which was burning as the fire spread from the utility shed. Defendant was quietly sitting on the steps wearing only a pair of pants and light colored socks. As defendant became abusive with members of his family and anyone attempting to talk to him, he was removed from the front of the residence. As he was being escorted to the street area, Officer Guidry noticed an odor of alcohol about him and he smelled of gasoline.
Officer Joseph Willinski of the city police arrived and observed that defendant wore only pants and socks. When Officer Wil-linski escorted defendant to his patrol unit, he noticed an alcohol odor on his breath. Defendant was nervous and excited from the verbal altercations and had to be settled down. Officer Willinski began questioning defendant on whether he knew how the fire started. Defendant’s initial response was he had been sitting outside on the steps smoking a cigarette but did not know how the fire started. Responding to further questions, defendant gave several different versions of what occurred that *534 night. One version was that someone had broken into the house and set the fire, but defendant could not give a description of the person. At one time defendant indicated he was not on the steps outside but was inside the house smoking a cigarette at the time of the fire but did not know how it started.
At the request of the city fire department, Officer Willinski took custody of defendant's socks and turned them over to Fire Department Captain Michael Kearney. A crime lab analysis later showed that the socks had some sort of flammable liquid on them.
Chief Jerry Delhomme of the fire department testified there was no electricity or gas connected to the utility shed, and for that reason he concluded the fire could not have started without someone’s help. Although the part of the house where Helen Daniels was sleeping did not catch fire, smoke filled the house so heavily that the firemen entering it had to use air packs. Chief Delhomme explained that smoke inhalation as opposed to the fire itself is the most likely cause of death of a person inside a dwelling. He said that a person sleeping in a shotgun house such as this could easily have died from smoke inhalation. Miss Daniels survived because the telephone awakened her.
The likelihood that human life would be endangered was also illustrated by the testimony of Captain Kearney, the arson investigator for the fire department. Based on his investigation of the scene, Captain Kearney’s opinion was that the entire house in which Miss Daniels was residing would have burned had it not been for the arrival of the fire department.
Earl Dixon, a next door neighbor on Friendship Street, saw defendant, on the afternoon of the fire, pouring something out of a gas can around the utility shed and around the house. Dixon at the time assumed defendant was killing grass. Sometime between 11:00 p.m. and 1:00 a.m., Dixon was awakened by his wife who noticed the fire next door. Mrs. Dixon called the fire department while Dixon went next door to see about Miss Daniels.
When Dixon reached the Daniels residence defendant remarked that a fire was in progress and inquired as to whether anybody was going to call the fire department. Dixon and a neighbor tried to put it out with water from a hose, but their attempts resulted in the fire becoming larger. The sudden eruption of the fire when Dixon and the neighbor tried to put it out with water, indicated, according to Chief Kear-ney, that some type of flammable substance or accelerator was involved.
At trial Dixon also testified that defendant, earlier on the day of the fire, threatened to burn Dixon’s house down. Defense counsel tried to discredit Dixon’s testimony by pointing out that he did not provide such information to the authorities. Dixon explained that he was more concerned with the fire at Miss Daniels’ house and was not questioned about threats made by defendant against him, therefore, he did not think to volunteer the information regarding defendant’s threats against him.
Dixon testified further that defendant remained sitting on the steps until his brother arrived, and that a physical altercation then occurred between defendant and his brother. According to Dixon, defendant’s brother knocked defendant down. The occurrence of this physical altercation was verified by Laura Dixon.
On the afternoon of the fire, Helen Daniels allowed defendant to use the phone in her house. Later that evening, Miss Daniels again saw defendant when she went to put out her garbage. Defendant cursed and pushed Miss Daniels and she, not responding to him, went inside and locked herself in her house. When she retired for the evening, defendant was still outside, talking to himself. She testified that she was awakened by the ringing of the phone, saw the fire as she went to answer the phone, and immediately exited the house through its only accessible door.
Richard Gobert, another neighbor, was sitting on the steps of a church located near 136 Friendship. Gobert testified that he saw defendant standing at the opening of the shed, using his hand in the manner of lighting a match or lighter and that then *535 the fire started. Gobert thought defendant then had on a shirt as well as pants and socks.
Gobert was incarcerated on a burglary charge at the time of trial and had been promised release from jail if he agreed to testify on behalf of the State. Gobert as a witness admitted this, but denied having been instructed to testify in a certain manner. Gobert explained also that he gave a statement regarding the fire right after it had occurred, and that the statement and his trial testimony were the same. Additionally, the State elicited from Gobert that he was arrested on the burglary charge sometime after the fire.
The socks worn by defendant on the night of the fire were analyzed and found to have had some sort of flammable liquid on them. A half pint metal container located near the fire scene was found and analyzed. This item contained a petroleum distillate. Finally, a gallon container of asphalt shingle material was removed from the concrete steps near the fire, but after analysis, it was found to contain no detectable accelerator. After a complete investigation of this fire scene, it was Captain Kearney’s expert opinion that the fire was intentionally set.
Defendant’s brother, Joseph Broussard, testified he received a call from defendant on the night of the fire about 11:30 p.m. telling him someone had broken into their father’s house at 136 Friendship Street. Joseph arrived at his parents’ home and found that the door lock had been broken, so he checked the house to see if anyone was inside. Finding no one in the house, defendant and his brother sat on the steps of the rent house and talked for about thirty-five minutes. Joseph left only to return an hour later after being informed of the fire. Joseph denied any physical or verbal altercation with his brother upon reaching his parents’ home this second time.
The jury was faced with some conflicting testimony as to the events of June 14,1986, and other testimony that was not in conflict. Apparently the jury found more credible the witnesses’ testimony establishing guilt. When there is conflicting testimony as to factual matters, evaluation of the credibility of the witnesses is within the sound discretion of the trier of fact and his determination will not be disturbed unless clearly contrary to the evidence. State v. Harvin, 437 So.2d 983 (La.App. 3 Cir.1983).
As it cannot be said the jury’s verdict is clearly contrary to the evidence, its factual determinations should not be disturbed on appeal. Viewing the evidence in a light most favorable to the prosecution, the evidence reasonably supports the verdict.
Defendant also asked us to review the record for error patent, which we have done, and we found none.
The conviction is affirmed.
AFFIRMED.